FILED

07/30/2021

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 28, 2021 Session

**ANGELA MICHELLE CELA v. SOKOL CELA**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-16-CV-1070      Kathryn Wall Olita, Judge**
_____

**No. M2019-01861-COA-R3-CV**
_____

In this divorce case, the wife appeals the trial court's calculation of her portion of the husband's military retirement and valuation of her speech therapy practice, as well as the overall division of marital assets. As appellee, the husband raises a number of issues, all of which are without merit. We vacate the portion of the trial court's judgment addressing the husband's military retirement and remand for recalculation of the wife's share in the same. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal As of Right; Judgment of the Circuit Court Vacated in Part; Affirmed in Part; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Roger A. Maness and Katie Klinghard, Clarksville, Tennessee, for the appellant, Angela Michelle Cela.

Mark R. Olson, Clarksville, Tennessee, for the appellee, Sokol Cela.

**OPINION**

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

Angela Michelle Cela ("Wife") and Sokol Cela ("Husband") were married on March 9, 2002. Wife and Husband share a son and a daughter, both of whom were minors at the time of trial. The family's primary residence was located at Trieste Trail in Adams, Tennessee (the "marital residence"), just east of Clarksville, Tennessee.

Husband served in the Marine Corps from September 9, 1997 until January 31, 2003. After a two-month hiatus, he joined the United States Army on April 1, 2003. The family moved to Clarksville in 2004 when Fort Campbell, Kentucky, became Husband's duty station. While at Fort Campbell, Husband was deployed abroad three times. In 2013, Husband began the Army's experimental test pilot school in Huntsville, Alabama. He spent 2014 in Maryland until he completed the program in December of that year. Husband then returned to Huntsville on assignment as a test pilot. He retired from the Army on August 8, 2018, and soon thereafter began working as a commercial pilot.

Wife stayed home with the children early in the marriage but returned to school in 2004 to pursue speech pathology training after it became clear that the couple's son had a learning disability. She received a bachelor's degree in 2007 and a master's degree in 2009, both from Tennessee State University. After working as a speech pathology therapist in Clarksville for about three years, Wife opened her own speech therapy practice, More Than Words, as a sole-member LLC in November 2012. The company's name was later changed to Mark Their Words ("MTW") following a trademark dispute.

On May 27, 2016, Wife filed a Complaint for Absolute Divorce in the Circuit Court for Montgomery County (the "trial court"), alleging as grounds irreconcilable differences or, in the alternative, Husband's inappropriate marital conduct. Husband filed an Answer and Counter Complaint for Absolute Divorce, and the trial court appointed a guardian ad litem to represent the children's interests. For the next three years, the parties filed a plethora of motions, which we need not reference for resolution of the issues presented in this appeal. We, however, discuss below some of orders entered by the trial court to provide context on the nature of pretrial litigation in this case. We also note that the parties unsuccessfully engaged in mediation three separate times throughout the course of proceedings in the trial court.

On July 29, 2016, the trial court adopted Husband's proposed temporary parenting plan, with some exceptions, and ordered the parties not to discuss the case with their children or make derogatory remarks about the other parent. In September 2016, the trial court entered an order mandating Wife to pay $1,303 per month in child support and $550 per month in spousal support. In November 2016, the trial court granted, in part, Husband's motions for civil contempt and for a restraining order, directing Wife to immediately pay $700 owed in spousal support and to provide complete responses to discovery requests and ordering the parties not to expose the children to paramours or to persons that would give the children "parental/life advice." In April 2017, the trial court granted Husband's motion for civil contempt and sanctions for Wife's failure to abide by the November 2016 order mandating complete discovery responses. The April 2017 order required Husband to provide Wife "written notice of any changes in his visitation schedule within (10) days' of the dates of the anticipated make up time." In June 2017, the parties submitted, and the trial court entered, an agreed order providing for the immediate listing for sale of the marital residence. The property, however, was not sold, and in June 2018, the trial court entered

an order granting Husband exclusive use of the home.

In January 2019, the guardian ad litem moved the trial court to set specific visitation for the children after they were left unaccompanied at a restaurant for a scheduled exchange between the parties during the 2018 Christmas break. On February 8, 2019, the trial court ordered Husband to provide Wife with his monthly flight schedule upon release by his employer; Wife to provide Husband with a monthly schedule of school and extracurricular activities; and for exchange between parents to occur at a designated restaurant. That same day, the trial court entered another order setting trial of the case for May 14 and 15, 2019.

On May 10, 2019, the trial court held a pretrial conference and set the hearing on Husband's motion for civil and criminal contempt for May 14, 2019. The day before trial, the trial court entered an order bifurcating the issues to be tried: divorce and parenting issues, including child support and contempt, would be tried on May 14, 2019; issues related to spousal support and marital property, including valuation of MTW would be tried on June 26, 2019.[1]

On the first day of trial, May 14, 2019, Wife testified on her own behalf and offered the testimony of Rob Clouser. Mr. Clouser, MTW's bookkeeper since its inception, stated that the company's income is reported under Schedule C of Wife and Husband's joint tax return. Wife testified that while obtaining her degrees in speech pathology from Tennessee State University, the children would often be in the care of Husband in Clarksville. After completing her master's degree in 2009, she worked as a therapist for the Clarksville school system and in private practice. Wife stated that she and Husband separated in May 2016. Concerning her failure to meet her child support obligations, Wife testified that her income had declined, in part, because MTW had lost twelve therapists over the previous year.

On May 15, 2019, Ms. Griskey, MTW's receptionist and Wife's personal assistant since January 2017, testified that they first met when her son received speech and feeding therapy at MTW. Ms. Griskey cleans Wife's home, does her laundry, and helps take care of the children, including transporting them to and from school and medical appointments when Wife is working or incapacitated by lupus.

Husband also testified. He stated that after completing test pilot school in Maryland in December 2014, he moved back to Huntsville, Alabama. Husband explained that by then, MTW had grown significantly and Wife was no longer willing to move to Huntsville as they had planned. To minimize expenses, he lived out of his camper in Huntsville and went home to Clarksville on Thursday nights until Monday mornings for a period of time. He confirmed that he and Wife separated in May 2016, when he stopped coming home. Husband explained that he decided to retire from the military and turned down offers to be a test pilot in order to move to Clarksville and be closer to the children. On May 15, 2019,

---

[1] Ultimately, the case necessitated an additional day for trial, which took place on July 26, 2019.

the trial court entered an order declaring the parties divorced.

On June 26, 2019, trial resumed, and Wife offered the expert testimony of Michael Wallace concerning the value of MTW. Mr. Wallace, who has been an accountant for twenty-five years, is accredited in business valuation and has been an expert witness on the subject in other divorce cases. He said that Wife is considered a sole proprietor for tax purposes because MTW is a sole-member LLC and all services provided by MTW staff are billed to insurance companies through Wife's social security number. Mr. Wallace indicated that he determined the "income approach" would not be a proper valuation method for MTW because it considers "overall enterprise value," and "[e]nterprise value and personal goodwill is not to be considered in a divorce in Tennessee for a sole proprietor and professional services." Enterprise goodwill, Mr. Wallace explained, refers to the customers' propensity to return to a business because of the elements that belong to the enterprise. Personal goodwill, on the other hand, means customers return to a business because of an individual. He asserted that MTW's business is made up of Wife's personal goodwill but stated that he was "not saying it's 100 percent personal goodwill." According to Mr. Wallace, Tennessee courts have held that personal professional goodwill is not a marital asset. Consequently, he used the "net asset approach" to value MTW at $82,000 as of May 31, 2019. Mr. Wallace acknowledged that he did not factor Wife's income into determining MTW's value, notwithstanding her draws as a proprietor of more than $600,000 between January 2018 and March 2019.

Husband called Joshua Hedrick as his expert witness. Mr. Hedrick is a financial consultant and analyst, who has conducted approximately 500 business valuations in the fields of healthcare, entertainment, manufacturing, and transportation. He treated MTW as a healthcare company for valuation purposes and explained that, generally, there are three different approaches to valuation: the asset approach, the market approach, and the income approach. The asset approach "look[s] at what the business owns, what the business owes, and that gives you a value." The income approach "looks at . . . the future cash flows of a company, and let's state that on a present value cash basis today." The market approach "looks at comparable companies, comparable transactions, and adjusts those or tries to determine how applicable they [a]re for this specific company."

For valuing MTW, Mr. Hedrick selected the income approach as the most appropriate after concluding that MTW is a "true business." He determined that the company is not a "classic sole proprietorship" because it "is marketed under MTW and performs work as a collection and a team of folks, not as [Wife]." Referring to MTW's legal dispute over its former name (More Than Words), he asserted that "from an economic perspective, you are not going to spend money fighting over a worthless thing." Using the income approach, Mr. Hedrick valued MTW at $790,000. He explained that he used the market approach[2] as a reasonableness check "to make sure that what [he] had completed

_____

[2] Following the market approach, Mr. Hedrick identified companies with $250,000 to 10 million in

- 4 -

on the income approach side made sense from a financial and economic perspective."

Mr. Hedrick testified that, in his expert opinion, ignoring the income approach is not a fair way to value MTW and that ignoring the marketability of the company is not a fair way to conduct the valuation under the asset approach. "[A]t the end of the day, this is a business that has been built into something greater than one person sitting in an office providing services. You can hire a manager very easily. I fully disagree with the idea that you can't hire someone to come in and manage." As to personal goodwill, he noted that between January 2018 and May 2019, Wife accounted for only 14.3 percent of MTW's total revenue; that is, 85.7 percent of MTW revenue was created by other providers. Therefore, he concluded, MTW is an enterprise business, despite the fact that the company does not have noncompete agreements with its employees.

Schedule C to the couples' joint tax returns introduced at trial indicate that MTW had the following gross receipts and net profit for tax years 2013 to 2017:

| Tax Year | Gross Receipts | Net Profit |
|---|---|---|
| 2013 | $536,250 | $141,581 |
| 2014 | $984,735 | $381,245 |
| 2015 | $1,174,123 | $348,239 |
| 2016 | $1,613,674 | $200,582 |
| 2017 | $2,137,879 | $365,063 |

For 2018, an internal Profit and Loss statement shows that MTW had total income of $1,957,089 and net income of $172,002. A partial, three-month Profit and Loss for January through March 2019 lists MTW's total income as $479,519 and net income as $52,344.

The trial was continued to July 26, 2019, when Wife called Laura Adams as a witness. Ms. Adams is a licensed speech therapist who worked at MTW for approximately five years before starting her own practice. She testified that, during her time with MTW, although the company provided speech, occupational, and physical therapy, Wife did not provide services other than speech therapy. Wife testified primarily about her role with MTW. She said that MTW was started with part of a monetary settlement she received after suing the State of Tennessee for denying her application for a minority grant for college. During her speech therapy training, Wife spent one year at Vanderbilt University getting specialized training in pediatric dysphagia, a swallowing disorder where a child cannot eat due to anatomical or physiological reasons. She is aware of only one other therapist in the region trained to treat that disorder. Wife explained that patients come to

---

sales and found three companies—two pediatric speech therapy practices and one speech and occupational therapy practice—that were comparable to MTW in terms of structure. Buyers of those companies paid .4 times the amount of revenue of the company or 3.3 times the average amount of its earnings before interest, taxes, depreciation, and amortization. Using this method, MTW's value ranged from $700,000 to $820,000.

MTW because "our company is fantastic, our girls are great, and they know that I run a pretty tight ship, and my reputation is excellent." She acknowledged that MTW employs a clinical supervisor, a back office supervisor, and an administrator. MTW receives referrals from the school systems in Clarksville, Nashville, and Kentucky, as well as from Vanderbilt physicians. The company bills multiple insurance companies for its services, and Wife negotiated the contractual rates with each insurance company. Wife explained that she bills all services provided by MTW—including speech, physical, occupational, and feeding therapy—through her social security number, which she is able to do because other providers are "contracted under." MTW's employees do not have employment contracts. Wife stated that MTW's name changed from "More Than Words" to "Mark Their Words" because a Canadian speech pathology company had the rights to the former name. Concerning her duties at the company, Wife said that besides providing speech therapy services, she is in charge of all marketing decisions, hiring, and scheduling. In addition, she signs sixty to seventy percent of the therapists' notes. Wife agreed that Husband performed some tasks for MTW in the past, such as changing a lightbulb, building a small set of stairs, or painting. MTW has a second location with three therapists, but Wife does not see patients there.

As to alimony payments, Wife stated that she does not have the income to make the payments because MTW has lost half of its staff and "if people aren't there making me money, I can't make money." She admitted that she "continue[s] to live like [she] was making $400,000 when I'm only making 180." In February 2019, Wife applied for a loan to purchase a crew cab pickup truck and indicated in the application that her annual income was $350,000 (or $29,166.67 monthly). She testified, however, that that was not her income in February 2019. In June 2019, Wife purchased a Tesla automobile for $87,000 with money borrowed from a different financial institution. She said she did not recall how much money she put down or how much she borrowed to purchase that vehicle. That same month, Wife obtained a $50,000 loan from USAA because "MTW has had a negative – loss for the past few months." She said it would not surprise her if she indicated in the application that her income was $32,000 per month. Wife admitted that she is the person "responsible for disbursements" at MTW but said she "cannot definitively give a number as to what [her] actual income was in any year." Wife asserted that she bought the Tesla automobile because "it was recommended because of the tax depreciation, something credit, that I get because the equity was the same in the Cadillac as what was owed." More specifically, Wife said that Mr. Hedrick, Husband's valuation expert, gave her the idea to buy the Tesla to leverage debt for tax purposes. When Counsel for Husband asked Wife if she was aware that she purchased the Tesla before Mr. Hedrick testified at trial, she responded: "No. However, I am aware that I was prepared for this because you guys have made a big hoopla about it . . . ."

Wife admitted that she made a $152,218.13 withdrawal from a Raymond James retirement account in December 2018. She agreed that she "violated the statutory injunction by taking money out of the account" and said: "I could possibly go to either

federal prison or Clarksville prison, and I made a choice; I absolutely did." She also admitted that she removed Husband as beneficiary in the account.

Husband testified next and stated that he works for a regional carrier but is trying to find a position with a mainline carrier because of better pay and better schedules. He is also pursuing employment opportunities with FedEx, which is based in Memphis and only a two-and-a-half hour drive from Clarksville. Concerning his contributions to MTW, Husband said that he wrote an employee handbook for the company drawing from his experience in the Army. Husband explained that he and Wife had agreed that she would contribute from her earnings at MTW "whatever income she was making at the time before she quit her job at the nursing home, which was 3,500-ish a month -- $4,000 a month, and that's how much she was taking out of the business and bringing to the family pot. And I was putting the rest of my income in there of about, I don't know, 8,000, whatever it was, take home, and that's how we manage the – I never saw any profits from More Than Words. She was peculiar – protective about that." Husband stated that he has received no child support or alimony payments in 2018 or 2019. He finds it surprising that Wife cannot recall things like her income and what she represented in loan applications because she is "really sharp." Husband also introduced into the record documents that indicate Wife's travel expenditures between June 2017 and August 2018 topped $105,000 and that she spent more than $33,000 on designer shoes between June 2017 and July 2018. Wife did not dispute the accuracy of these figures.

Husband's only other witness was Ronald James Watts. Mr. Watts testified that they have been friends for about four years and that he would help Husband with moving offices and building items for MTW when Husband was home from Alabama. Mr. Watts added that Husband also did "computer work, moving monitors, hooking up equipment, moving complete offices around, building different things, as were in the building itself."

After the closing of proof, the trial court reserved its ruling and asked the parties to submit proposed findings of fact and conclusions of law within 30 days. Six days later, on August 1, 2019, the trial court entered a temporary parenting plan order to be in effect until its final ruling on the issue.

On September 20, 2019, the trial court entered a Memorandum Opinion and Order (the "final order"). We will focus on the aspects of the final order relevant to the issues raised by the parties in this appeal. The trial court determined that Wife's monthly income for calculating child support is $23,568.54 based on the income reported on the parties' joint tax returns, finding the returns "most instructive and reliable." The trial court found Wife guilty of criminal contempt for her failure to pay child support and alimony as ordered and for violating the statutory injunction by withdrawing $152,218.13 from a retirement account in December 2018 and changing Husband as the beneficiary on the account, for which she was sentenced to ten days of incarceration. The trial court also found Wife guilty of civil contempt for the same reasons and reduced the past due support owed to

Father to an executable judgment in the amount of $57,433. Related to this ruling, the trial court found that Wife's testimony on the issue of buying the Tesla was "not credible and, in conjunction with other evasive and dismissive testimony . . . given throughout this trial, establishes that she lacks credibility generally." The trial court added that Wife's "flippant attitude and ambiguous excuses for failing to pay the court ordered support obligations are without merit and do not make her a credible witness."

The trial court then turned to the valuation and division of marital estate, which is comprised of the marital residence, Husband's military retirement, and MTW. The trial court awarded the marital residence to Husband, finding that the home had been purchased using military benefits and that Husband had made mortgage payments without contribution from wife since August 2017. For calculating Wife's share of Husband's military retirement, the trial court employed the method "accepted" by DFAS,[3] which it described as "multiplying 50% times a fraction, the numerator of which is the number of months of marriage during the member's creditable military service, divided by the member's total number of months of creditable service." For the fraction's denominator, the trial court found that Husband's total military service equated to 249 months between September 1997 and August 2018. For the numerator, it ruled that the number of months Husband was married to Wife while in service should be fixed at 119 months, after applying a forty-eight-month reduction because Wife did not travel with Husband when he had to go to Maryland or Huntsville "to work to support the family" while, on the other hand, she earned her degrees "in part as a result of [Husband's] military employment, which afforded the couple healthcare, child care[,] and reliable income." Using these figures for the fraction, the trial court determined that Wife was entitled to a 23.89 percent share in Husband's military retirement.[4]

As to the value of MTW, the trial court found that there was no dispute MTW is a marital asset and that personal goodwill is not a marital asset to be considered "in making an equitable distribution of the marital estate." On the other hand, "inclusion of enterprise goodwill in the valuation of a business in a Tennessee divorce is not strictly forbidden." Based on these findings, the trial court accepted the value of $790,000 provided by Husband's expert but determined that a 14.3 percent reduction was appropriate to account for Wife's personal goodwill (the percentage of therapy services she provided). The trial court ruled that the resulting value of $677,030 should be divided equally among the parties, the Husband's share of $338,515 to be regarded as alimony *in solido* to be paid by Wife in a "monthly amount to be agreed upon by the parties" and with no interest assessed. Other than this award, the trial court declined to award spousal support given the parties' respective capacities to generate income.

---

[3] "DFAS" refers to the Defense Financing Accounting Service, an agency of the U.S. Department of Defense.

[4] Wife's share = (119 / 249) x 50% = 23.89%

Husband filed multiple post-judgment motions with the trial court; some within thirty days after entry of the final order, some after that date. Such motions, and their associated orders, are not part of this appeal.[5] Wife timely appealed to this Court on October 15, 2019.

## II. ISSUES PRESENTED

Wife raises three separate but related issues on appeal:

1. Whether the trial court erred and abused its discretion in its division of the Husband's military retirement.

2. Whether the trial court erred and abused its discretion in its valuation of the Wife's speech pathology practice.

3. Whether the trial court erred and abused its discretion in its overall division of the marital estate.

Husband also raises several issues, which we consolidate and restate as follows:

4. Whether the trial court improperly designated the alimony *in solido* award, and whether Husband should be awarded interest on the award.

5. Whether the trial court erroneously determined Wife's income for child support purposes.

6. Whether Husband should be awarded his attorney's fees at trial and on appeal.

## III. STANDARD OF REVIEW

Our Supreme Court has defined the standard of review appellate courts should apply when reviewing issues of property classification and division in divorce proceedings:

> The classification of particular property as either separate or marital is a question of fact to be determined in light of all relevant circumstances. *See Langford v. Langford*, 220 Tenn. 600, 421 S.W.2d 632, 634 (1967); *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App.

---

[5] We note, however, that the trial court entered, on December 6, 2019, a "Military Qualifying Court Order" reflecting its determination that Wife was entitled to a 23.89 percent fraction of Husband's military retirement, and on May 7, 2020, an order directing Wife to pay alimony *in solido* awarded in the final order in monthly installments of $1,880.64 for a period of fifteen years.

1995). This Court gives great weight to a trial court's decisions regarding the division of marital assets, and we will not disturb the trial court's ruling unless the distribution lacks proper evidentiary support, misapplies statutory requirements or procedures, or results in some error of law. *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). As to the trial court's findings of fact, "we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary." *Id.* However, we accord no presumption of correctness to the trial court's conclusions of law. *Id.*

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245–46 (Tenn. 2009).

## IV.    ANALYSIS

### A.    Issues Raised by Wife as Appellant

1.    Husband's Military Retirement

Wife argues that the trial court miscalculated the portion of Husband's military retirement to which she is entitled. Specifically, she asserts that the trial court erred in determining the number of months Husband was married to Wife while in service, including the trial court's application of a 48-month reduction. We agree.

In determining Wife's award, the trial court relied on the method accepted by the United States Department of Defense's Defense Finance and Accounting Service (DFAS):

> The Mother is awarded a percentage of the Father's disposable military retired pay, to be computed by multiplying 50% times a fraction, *the numerator of which is the number of months of marriage during the member's creditable military service*, divided by the member's total number of months of creditable military service. This fraction shall be used to determine the Mother's portion of the military retirement.

(Emphasis added). To arrive at the applicable fraction, the trial court used a denominator equal to 249 months of Husband's creditable military service, from the time he joined the Marine Corps in September 1997 until he retired from the Army in early August 2018 (except for a two-month hiatus in 2003 while transitioning between the two branches). The record supports, and Wife does not dispute, this finding. The trial court used a numerator equal to 119 months after purportedly reducing by 48 months the total number of months of marriage during Husband's creditable military service. The final order states that the trial court considered it "appropriate to reduce the time in which [Wife] has an interest in the retirement of [Husband]" because Wife had been conferred a "lifetime benefit" in being able to earn her academic degrees in part due to Husband's military employment; Wife did

- 10 -

not travel to facilitate Husband's career when he had to train in Maryland and live in Huntsville to support the family; Husband lived in a camper for a period of time to help the family's finances and get MTW off the ground; and the parties had separated in May 2016. Using the DFAS computation, the trial court awarded Wife a 23.89 percent interest in Husband's military retirement.[6]

We have no quarrel with the trial court's decision to reduce the number of months determining Wife's interest in Husband's military retirement by forty-eight months. Over half of that figure corresponds to the months elapsed between the parties' separation in May 2016 and trial court's declaring them divorced in August 2018. Moreover, given its consideration of the Wife's unwillingness to move with Husband and Husband's contributions to her career as a speech pathologist, we will not disturb the trial court's decision to discount additional months. However, it is plain to us that the trial court erred in calculating the applicable number of months to be used as the numerator under the DFAS method to be 119 months. Although the final order does not state how the trial court arrived at this number of months, our review of the record indicates that the parties were married for a total of 195 months[7] while Husband served in the military, from their marriage in early March 2002 until Husband's retirement in early August 2018 (except for the two-month hiatus between branches in 2003). 195 total months of marriage during Husband's military service minus the forty-eight months discounted by the trial court equals 147 months. We thus vacate the trial court's ruling as to the numerator under the DFAS method and remand for a correct calculation of Wife's share in Husband's military retirement pay.

2.      Valuation of MTW

Wife takes issue with the trial court's valuation of her speech therapy practice. She contends that the trial court should have adopted the fair market value provided by her expert witness, Michael Wallace, because he selected the proper method for valuating the company. Husband responds that the trial court correctly accredited the valuation opinion of his expert, Joshua Hedrick, in determining MTW's fair market value to be $677,030.

A trial court should "place a reasonable value on each piece of [marital] property subject to division." *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007) (citing *Davidson v. Davidson*, No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *2 (Tenn. Ct. App. Oct. 31, 2005); *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003)). When presented with conflicting evidence as to value, the trial court "may place a value on the property that is within the

_____

[6] Under the DFAS method, 50% times .4779 (which results from dividing 119 by 249) equals 23.89%.

[7] In her brief, Wife states that the parties were married a total of 194 months while Husband served in the military. The one-month discrepancy appears to arise from Wife's use of a three-month hiatus between Husband leaving the Marine Corps on January 31, 2003 and joining the Army on April 1, 2003. Husband's break in service was in fact only for the months of February and March 2003.

range of the values represented by all the relevant valuation evidence." *Id.* (citing *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997); *Brock v. Brock*, 941 S.W.2d 896, 902 (Tenn. Ct. App. 1996)). Moreover, valuation evidence is inherently subjective and, therefore, a trial court's valuation decisions "need not coincide precisely with the valuation opinions offered into evidence." *Id.* at 489 (citing *Waits v. Waits*, No. 01A01-9207-CV-00288, 1993 WL 49564, at *3 (Tenn. Ct. App. Feb. 26, 1993)). Because the value placed on marital property is a question of fact, *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998), we will not overturn the trial court's determination unless it is "not supported by a preponderance of the evidence." *Owens*, 241 S.W.3d at 486 (citing *Smith v. Smith*, 93 S.W.3d 871, 875 (Tenn. Ct. App. 2002); *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995)). We note, however, that when a business is part of the marital estate, Tennessee courts adhere to the rule that personal goodwill of one of the spouses in the business is not a marital asset that can be divided among the parties. *Fuller v. Fuller*, No. E2016-00243-COA-R3-CV, 2016 WL 7403791, at *5 (Tenn. Ct. App. Dec. 21, 2016) (citing *Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985)). That is because "[t]here is a disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value." *Smith*, 709 S.W.2d at 592.

In this case, the parties' respective expert witnesses presented the trial court with conflicting views about how to best determine MTW's fair market value. Although the experts agreed that there are three primary approaches to valuation—the asset approach, the income approach, and the market approach—each selected a different method. Their contention centered around how much enterprise goodwill the company possessed. Wife's expert, Mr. Wallace, testified that MTW's goodwill was almost entirely comprised of Wife's personal goodwill because the company, as a health care practice, is treated as a sole proprietorship (for tax purposes), its employees do not have noncompete agreements, business does not repeat (with exception of siblings), and its operations continued unhindered after the company's name change. Mr. Wallace thus declined to utilize the income approach because that method would consider "overall enterprise value." Instead, he selected the net asset approach and determined MTW's value to be $82,000. Mr. Wallace acknowledged that, under the net asset approach, he did not factor Wife's income into determining the company's value, notwithstanding Wife's proprietor's draws of more than $600,000 from January 2018 to March 2019.

On the other hand, Husband's expert, Mr. Hedrick used the income approach to determine that the company's fair market value was $790,000. He testified that the income approach was the most appropriate for a company like MTW, which is a "true business" and not a "classic" sole proprietorship. To that point, Mr. Hedrick noted, concerning the legal dispute over MTW's original name, that "from an economic perspective, you are not going to spend money fighting over a worthless thing." He also observed that between January 2018 and May 2019, Wife was responsible for only 14.3 percent of MTW's total collections, with the balance of revenue being created by other providers. Mr. Hedrick said

that he considered that MTW lacks noncompete agreements with its employees in determining the company's value but explained that such fact is not determinative: "So Starbucks doesn't have noncompetes, but there's value in the enterprise. If a barista leaves tomorrow, then you hire another barista. That is what an enterprise looks like. That's what a business looks like." He also pointed out that MTW's independent contractor agreement contains a non-solicitation clause. Mr. Wallace opined that "the reason why [customers come to MTW] is in the business itself, the enterprise, the name of the business, the assembled workforce, the systems that have been put into place."

The fair market value the trial court placed on MTW—$677,030—is within the range of the valuation evidence presented by Mr. Wallace and Mr. Hedrick. *See Owens*, 241 S.W.3d at 488. The trial court discounted by 14.3 percent (or $112,970) the $790,000 value given by Mr. Hedrick, to account for the company's revenue personally generated by Wife as her personal goodwill in the company. The trial court's decision to use a value generated by the income approach is supported by Mr. Hedrick's testimony and the facts in the record concerning MTW operating as a true business with enterprise goodwill. So was the trial court's decision to discount that value by the amount of revenue personally generated by Wife. Under these circumstances, we will not second-guess the trial court's determination of the company's value.

Wife relies on this Court's opinions in *Ogles v. Ogles*, No. M2013-02215-COA-R3-CV, 2015 WL 113336 (Tenn. Ct. App. Jan. 7, 2015) and *Duke v. Duke*, No. M2009-02401-COA-R3CV, 2012 WL 1971144 (Tenn. Ct. App. June 1, 2012) to support her assertion that her personal goodwill is so critical to MTW's viability that, absent a guarantee through a non-compete agreement that she will remain with the company, the trial court should have adopted her expert witness's valuation based on the net asset approach. Wife's reliance on these two cases is misplaced. In *Ogles*, a divorce proceeding, a wife appealed the value assigned by the trial court to an electrical service business started by her husband. 2015 WL 113336, at *1, *3. As here, the parties' expert witnesses selected different valuation methods, with the wife's expert witness arriving at a greater value for the business. *Id.* at *3. The wife argued that the trial court erred in concluding that the excess value determined by her expert under the capitalization of earnings approach corresponded to the husband's personal goodwill in the business, which would not be considered a marital asset. *Id.* at *4. The *Ogles* court affirmed the trial court's decision to accept the value provided by the husband's expert witness under the asset value approach, concluding that "the weight of the evidence demonstrated that the goodwill [of the business] was more attributable to [the husband] personally than to [the business]." *Id.* In the instant case, the trial court's pertinent findings are almost diametrically opposed to the evidence referenced by the *Ogles* court. Here, Wife handed off her patients to other providers at MTW during a leave of absence in 2016; the company's business carried on successfully during Wife's absence; business continued uninterrupted during a subsequent leave of absence by Wife lasting eight weeks in 2018; Wife does not go to MTW's second location; the therapy services Wife provides to patients account only for 14.3 percent of the company's

production; and Wife repeatedly testified that people are making money for her. The record supports these findings, and these findings support the trial court's conclusions that MTW is a successful enterprise; that Wife has established a business model that leverages others' skills and services to generate income; and that MTW is not reliant on any single specific provider. Further, the trial court expressly considered Tennessee law concerning personal goodwill and found that "MTW has a value over and above the net asset value" and that "the Income Approach is the more appropriate valuation method." Under these circumstances, *Ogles* is inapposite.

As to the *Duke* opinion, contrary to what Wife suggests in her brief, this Court did not stress the importance of a non-compete agreement as a determinative factor in selecting a valuation method. Rather, the opinion simply quoted the trial court's explanation for adopting one expert's valuation over that of another. *Duke*, 2012 WL 1971144, at *7–8. The *Duke* court concluded: "Considering the entire record, the evidence does not preponderate against the opinion of value expressed by [the husband's expert witness]. The value set for [the business] by the trial court was within the range of values presented by the experts; consequently, the court did not err in determining the value of [the business] to be $5.4 million." Having found the same circumstance here, we decline to overturn the trial court's decision as to MTW's value.

3.    Overall Division of Marital Property

Wife also contends that the trial court's mathematical errors in calculating her share of Husband's military retirement and the equity in the marital residence resulted in an inequitable division of the marital estate. Husband responds that the trial court did not err in its division of marital property because the record supports the trial court's findings of fact with respect to the three items of marital property—the marital residence, Husband's military retirement, and MTW.

After classifying and valuing marital property, a trial court endeavors to equitably divide it among the parties. *See* Tenn. Code Ann. § 36-4-121(a)(1); *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014) (citing *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001)). An equitable division of marital property does not require that the property be divided equally. *Id.* at 109–10 (citing *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002)). Nor does it require that each party receive a share of every item classified as marital property. *Morton v. Morton*, 182 S.W.3d 821, 833–34 (Tenn. Ct. App. 2005) (quoting *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998)). In making its determination, the trial court must consider statutory factors in view of the evidence presented by the parties. Tenn. Code Ann. § 36-4-121(c); *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). However, the trial court has broad discretion in devising an equitable division of marital property, and this Court will not overturn the trial court's determination unless "it is inconsistent with the statutory factors or lacks proper evidentiary support." *Trezevant v. Trezevant*, 568 S.W.3d 595, 607 (Tenn. Ct. App. 2018) (citing

*Baggett v. Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013)).

As we have already determined, Wife correctly asserts that the trial court miscalculated Wife's share of Husband's military retirement by using an incorrect fraction, and the case is being remanded for correction in that regard. We also agree with Wife that the trial court made a mathematical error in calculating the value of equity in the marital residence to be approximately $15,000. In its final order, the trial court stated that it had credited the Father's testimony that the home's current value was $490,000. Husband testified at trial that the amount owed on the mortgage was "in the neighborhood of $430,000." Given these figures and "taking into account a 6% commission" as the trial court did, the value of equity in the home is approximately $30,000, not $15,000. Wife requests that we modify the trial court's division the marital estate on this basis. For the following reasons, we conclude that this error does not render the trial court's overall division of marital property inequitable.

The final order sets forth the evidence relevant to the trial court's consideration of each factor listed in Tennessee Code Annotated section 36-4-121(c). Although evidence presented on most of these factors did not favor either spouse, the trial court noted: "[Wife] dissipated a fairly healthy retirement account in December of 2018 with no notice to [Husband]. She is solely responsible for the dissipation of that asset, which reduces the marital estate available for division between these parties." *See* Tenn. Code Ann. § 36-4-121(c)(5)(B).[8] This finding of fact is supported by the record. Indeed, the trial court cited Wife's own admissions in support of its finding that the "withdrawal of funds from the retirement account" was "both intentional and done with a culpable state of mind" and that Wife was guilty of criminal contempt. In addition, as it relates to the marital residence, the trial court found that Wife did not pay her portion of the mortgage for a period of nineteen months, in violation of the statutory injunction and totaling approximately $25,000. In light of the resulting monetary windfall to Wife from withheld mortgage payments and of her sole responsibility for reducing the marital estate to the tune of more than $150,000, which the trial court expressly considered, we cannot conclude that the trial court's division of the marital estate is inconsistent with the statutory factors, lacks evidentiary support, or is inequitable, even considering the trial court's miscalculation of the equity in the marital residence. This issue is without merit.

## B. Issues Raised by Husband as Appellee

1. Alimony *in solido* Award

Husband argues that the trial court should have awarded him interest on the alimony

---

[8] "[D]issipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed." Tenn. Code Ann. § 36-4-121(c)(5)(B).

in *solido* award "to protect [his] interest, which, as a result of inflation, becomes worth less each year." Wife does not dispute that Husband would be "entitled to post-judgment interest on unpaid installments." Under Tennessee Code Annotated section 47-14-122, "[i]nterest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial." This Court has long construed the statute's language as clearly mandatory. *See Sanders v. Sanders*, No. M1998-00978-COA-R3-CV, 2001 WL 1660715, at *5 (Tenn. Ct. App. Dec. 28, 2001) (citing *Vooys v. Turner*, 49 S.W.3d 318, 322 (Tenn. Ct. App. 2001); *Inman v. Inman,* 840 S.W.2d 927, 932 (Tenn. Ct. App. 1992); *Bedwell v. Bedwell*, 774 S.W.2d 953, 956 (Tenn. Ct. App. 1989)). Furthermore, this statutory obligation is not abrogated by a trial court's omission of language awarding post-judgment interest. *See, e.g.*, *Burge v. Farmers Mut. of Tennessee*, No. M2016-01604-COA-R3-CV, 2017 WL 1372864, at *10 (Tenn. Ct. App. Apr. 13, 2017) (citing *State v. Thompson*, 197 S.W.3d 685, 693 (Tenn. 2006); *Taylor v. George*, No. E2014-00608-COA-R3-CV, 2015 WL 1218658, at *10 (Tenn. Ct. App. Mar. 16, 2015) (same); *Varnadoe v. McGhee*, 149 S.W.3d 644, 650 (Tenn. Ct. App. 2004) (citing *Tallent v. Cates*, 45 S.W.3d 556, 563 (Tenn. Ct. App. 2000)). "The obligation to pay post-judgment interest applies to spousal support obligations, but when a decree provides for the periodic payment of spousal support, post-judgment interest does not begin to accrue until each obligation to pay support actually matures." *Sanders*, 2001 WL 1660715, at *5 (citing *Price v. Price*, 472 S.W.2d 732, 734 (Tenn. 1971)). Here, the trial court entered an order directing Wife to pay alimony *in solido* award in monthly installments of $1,880.64 for a period of fifteen years, and Husband is entitled to post-judgment interest accruing at the time each monthly payment is due. His argument is simply unnecessary as his right to post-judgment interest is statutory.

Husband also contends that the trial court erred by failing to designate a specific day of the month for Wife to pay each monthly installment. Husband also states in his brief that, under these circumstances, "the last day of each month, by default, is the date." We agree and, in so doing, discern no need to remand on this issue. Wife is required to make payments on the alimony *in solido* award by the last day of each month until the judgment is satisfied in full, as specified by the trial court's May 7, 2020 order.

2.      Wife's Income Determination for Child Support Purposes

Husband argues that the trial court erred in determining that Wife's monthly income for child support purposes is $23,568.54. He contends that the most recent evidence of income submitted at trial—that is "Proprietor's Draws" from January 2018 through May 2019—shows that Wife monthly income was $37,470. This Court reviews decisions related to child support using the deferential abuse of discretion standard. *State ex rel. Robbie B. v. Siva M.*, No. M2019-00115-COA-R3-JV, 2020 WL 2897279, at *2 (Tenn. Ct. App. June 3, 2020) (citing *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005)). Under this standard, we will not disturb the trial court's decision unless the trial court applied an incorrect legal standard, reached a decision that is illogical, based its

- 16 -

decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party. *Id.* (citing *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001)).

At the outset, we note that our review of the record reveals that Husband's position on this issue is different from the one he took before the trial court. Husband's Proposed Findings of Fact and Conclusions of Law submitted into the trial court state that Wife's monthly income should be "the average of the income claimed by [her] in credit applications and Mr. Clouser's findings, or $32,055.25 monthly." He now asserts that Wife's monthly income should be determined from her Proprietor's Draws. In the end, after reviewing the conflicting income figures found in Wife's credit applications and her Proprietor Draws and acknowledging that Wife is "self-employed and her income is variable," the trial court concluded that the parties' 2016 and 2017 joint tax returns were the "most instructive and reliable" source to determine her income for child support purposes. Having reviewed the evidence considered by the trial court and its credibility findings, we find that the trial court's decision to base its determination on the parties' joint tax returns does not constitute an abuse of discretion.

3.      Attorney's Fees

Husband first argues that the trial court should have awarded him his attorney's fees at trial because of Wife's egregious conduct in refusing to comply with the trial court's orders concerning child and spousal support, which eventually led to a finding of both civil and criminal contempt on her part. He also points to the parties' disparity in income while married. Wife responds that the trial court did not abuse its discretion in declining to award attorney's fees and that both parties currently have the capacity to earn substantial income. This Court examines a trial court's decision concerning attorney's fees awards under a "less stringent 'abuse of discretion' standard of review." *Richardson*, 189 S.W.3d at 729.

Without question, the trial court had statutory authority to award Husband his attorney's fees related to enforcing its child and spousal support orders. *See* Tenn. Code Ann. § 36-5-103(c) ("A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce . . . any decree of alimony, child support, or provision of a permanent parenting plan order . . . ."). The trial court, however, declined to so do. Instead, it entered a monetary judgment of $57,433.00 against Wife for all past-due support owed to Husband as punishment for civil contempt and sentenced Wife to ten days of incarceration as punishment for criminal contempt. Husband did not set forth reasons why the trial court abused its discretion in declining to award him attorney's fees as punishment for contempt, other than alluding to the parties' disparate income during marriage. Under the circumstances of this case, including the parties' respective ability to generate income, we find no basis to disturb the trial court's ruling.

Husband also asserts that he is entitled to his attorney's fees on appeal, citing to Tennessee Code Annotated sections 27-1-122 and 36-5-103(c) as statutory authority for the award. Under section 27-1-122, a reviewing court may award expenses incurred by the appellee if it finds that the appeal "was frivolous or taken solely for delay." *Id.* § 27-1-122; *see also Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017) (citing *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009) (holding that when an appellate court determines that an appeal is frivolous, it may, in its discretion, "award attorney's fees pursuant to this statute"). Yet, these discretionary awards are made "sparingly so as not to discourage legitimate appeals." *Eberbach*, 535 S.W.3d at 475 (quoting *Whalum v. Marshall*, 224 S.W.3d 169, 181 (Tenn. Ct. App. 2006)). Section 36-5-103(c) provides that a prevailing party in any "proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order" may, in the court's discretion, recover attorney's fees on appeal from the non-prevailing party. *Id.*; *see also Eberbach*, 535 S.W.3d at 477 (citing Tenn. Code Ann. § 36-5-103(c)) ("Thus, when appellate attorney's fees are requested pursuant to statutes like . . . section 36-5-103(c), which expressly permit the court to exercise its discretion, the Court of Appeals should analyze any such request by exercising its discretion to determine whether an award to the prevailing party is appropriate.").

We decline to grant Husband's request for his attorney's fees on appeal. First, we conclude that this appeal is not frivolous or taken solely for the purpose of delay, as contemplated under section 27-1-122, given our determination that the trial court erred in calculating the Wife's portion of Husband's military retirement and the value of the equity in the marital residence, as Wife argued before this Court. Second, we lack authority to award Husband attorney's fees on appeal under Tennessee Code Annotated section 36-5-103(c) inasmuch as he did not prevail in arguing before this Court that the trial court's final order should be modified with respect to his alimony *in solido* award or Wife's income for child support purposes.

## V.

### CONCLUSION

The judgment of the trial court is vacated in part, affirmed in part, and remanded to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to the parties, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE

- 18 -